Steífen, J.,
dissenting:
I dissent.
In Hansen v. Harrah’s, 100 Nev. 60, 675 P.2d 394 (1984), we properly filled a legislative void and provided public policy relief for an injured workman who was terminated in retaliation for filing a workmen’s compensation claim. In Goldstine v. Jensen Pre-Cast, 102 Nev. 630, 729 P.2d 1355 (1986), we improperly (I suggested in dissent) allowed a worker to recover compensation, notwithstanding his fraud on the employer, because the legislature had not provided for such a contingency. Today we conclude that an incarcerated felon may collect workmen’s compensation insurance because the legislature failed to deny coverage to such persons.
I am strongly opposed to judicial intrusion into the realm of the legislative branch of government. And yet, many times the courts are called upon to apply a rule of reason to legislative voids or lacunae in order to facilitate the purpose and intent of a statute.
The majority suggests that I have failed to recognize that in the Harrah’s case we created law in order to grant relief to an injured worker, whereas the instant case would deprive a worker of benefits if my position were to prevail. In my view, the majority has simply missed the mark. In Harrah’s, we ruled as we did in recognition of a strong public policy. The rationale of the opinion in Harrah’s did not, as suggested by the majority, relate to a liberal construction of the workers’ compensation laws in order to provide Hansen with his rightful benefits. There was simply no provision to construe as a basis for supporting our result in *1003 Harrah’s. Rather, Harrah’s was a proper recognition of a strong public policy against discharging an injured worker in retaliation for presenting a rightful claim for benefits. Had we ruled otherwise, there would have been a strong chilling effect on workers presenting their just claims for industrial injuries.
My reason for dissenting from the ruling of the majority is that I perceive a public policy in the instant case that is equally as strong as the public policy that prompted our ruling in Harrah’s. Here, the majority provides Campbell a double dip from the taxpayers’ funds. Moreover, Campbell’s double recovery represents a form of reward for his criminal behavior. I suggest that neither result is justified.
It seems clear to me that this court would be no less properly advancing the common law by denying Campbell benefits to which he is not entitled than it was in granting Hansen relief in Harrah’s which had never been provided by the legislature. My rationale for denying Campbell relief is based upon the identical principle that supported our ruling in Harrah’s. Public policy should be just as controlling in the instant case as it was in Harrah’s.
I thus have no difficulty discerning a public policy as strongly against the result reached by the majority today as the public policy that so compellingly favored the relief we accorded the injured workman that suffered retaliatory discharge in Harrah’s. The majority, in permitting Campbell to reap a reward for his own wrongdoing, does so with an expression of regret attributable to the legislature’s failure to provide for such a situation. In so reasoning, the majority neglects to remember that the legislature was equally silent with respect to the relief we fashioned in Harrah’s.
Although I dissented in Goldstine because of the strong legal principle against rewarding persons for their own wrongdoing, at least in Goldstine we had an injured workman who was presumably in need of his daily subsistence. Here we have a claimant who, as a result of his own criminal conduct, received a prison sentence which, of necessity, required the furnishing of his daily food, clothing and lodging at taxpayers’ expense. The majority contends in effect that because the legislature did not deny incarcerated persons workmen’s compensation benefits during their periods of confinement, we must assume the dubious proposition that the legislature intended that such persons receive what is tantamount to a double recovery.[1]I find it as difficult to attribute *1004 such an intention to the legislature as it would have been to conclude that the legislature would have condoned retaliatory discharge under the Harrnh’s situation because it failed to provide remedial legislation for such a circumstance.
I consider equally unacceptable the majority’s affirmation of the appeals officer’s position that because Campbell was incarcerated, he “neither obstructed nor refused to submit to a CIW [comprehensive integrated work-up]. . . .”[2] Who must we presume interfered with Campbell’s appointment for the required CIW: the criminal justice system? the prison officials? or perhaps the inanimate facilities that restrained his ability to travel? I suggest that when Campbell used his free agency to commit a crime against society, thus subjecting himself to a potential loss of his personal freedom, that he and he alone frustrated the performance of the CIW, thus suspending his right to compensation. Perplexingly, the appeals officer and this court’s majority impliedly conclude that someone, something, or some force other than Campbell obstructed performance of the CIW.
SIIS reasonably and understandably insists that the statutory phrase “capable of any gainful employment”[3] “clearly implies a legislative intent to grant benefits for the replacement of lost wages.” SIIS thus concludes that since the prison system provided Campbell’s daily bread and lodging, and since, by his own voluntary act, Campbell rendered himself unavailable for entry into the work force, he did not lose any wages.
Finding the System’s reasoning unpersuasive, the majority concludes that it prefers to “leave such decisions to the discretion of the legislature.” I must agree with SIIS. Campbell, by his own deliberate act, removed himself from the work force and should not be rewarded at the expense of the solvency of the System during his period of incarceration.[4]
Campbell first preyed on society by committing an act of burglary which ultimately resulted in the incarceration that prevented him from attending the CIW which, under normal circumstances, would have been a necessary condition for receiving further temporary total disability benefits. In prison, Campbell received board and room courtesy of the Nevada taxpayers. Finally, since he was in prison and could not attend his medical evaluation (CIW), today’s opinion presents Campbell with a *1005 second layer of taxpayer benefits on grounds that in committing his crime, he did not intend to hinder his required examination. With due respect to my colleagues in the majority, I am unable to find any sensible reason for agreeing, including the fact that a majority of our sister courts evidently drink from the same well. Campbell, and Campbell alone, was responsible for not keeping his appointment for the CIW. Whether he intended, by his criminal act, to be apprehended and jeopardize his entitlement to industrial compensation is of no moment. The result is identical, whether he voluntarily avoided the CIW or, by his voluntary criminal act, denied himself the opportunity to keep the CIW appointment.
Moreover, I am of the opinion that the never-ending, ever-increasing governmental claim on the fruits of taxpayers’ labor will one day soon reach an intolerable limit. When it does, I seriously doubt that we will tolerate double recoveries by incarcerated felons.
For the reasons specified above, I respectfully dissent.

There is no contention that Campbell needed his disability benefits in order to care for dependents. Presumably, if Campbell had family dependent upon him during his incarceration, welfare assistance would have been available to assist with their needs.

See NRS 616.535 as set forth and highlighted in majority opinion, footnote 2.

See majority opinion, footnote 3.

I must assume under the majority’s reasoning, that if Campbell had committed a crime resulting in a life sentence, he would have received compensation from the System indefinitely.